* * * * * * * * * * *
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Deluca and the briefs and arguments of the parties. The appealing party has shown good ground to reconsider the evidence. Accordingly, the Full Commission reverses the Opinion and Award of the Deputy Commissioner and enters the following Opinion and Award.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are properly before the Commission, and this is the Court of proper jurisdiction for this action.
2. All parties have been correctly designated, and there is no question as to *Page 2 
misjoinder or nonjoinder of parties.
3. On the alleged date of injury, the parties were subject to, and bound by, the provisions of the North Carolina Workers' Compensation Act.
4. At all relevant times, an employment relationship existed between the parties.
5. North Carolina State University is self-insured. Key Risk Management Services is the administering agency on the risk.
6. The Pre-Trial Agreement, medical records, and Industrial Commission forms were stipulated into the record.
7. Plaintiff's average weekly wage was $520.80, which produces a compensation rate of $347.22.
 * * * * * * * * * * *
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before Deputy Commissioner Deluca, plaintiff was 61 years of age with a college degree in Spanish. Plaintiff's work history includes teaching at John Umstead Hospital, working at the library at Duke University and working as a library assistant for defendant-employer.
2. Plaintiff's medical history includes high blood pressure, arthritis, carpal tunnel syndrome and right thumb surgery due to an arthritic condition in approximately 1990. None of these conditions affected plaintiff's ability to work. Furthermore, plaintiff has no history of prior back problems.
3. On May 22, 1998, plaintiff sustained an admittedly compensable injury by *Page 3 
accident arising out of and in the course and scope of her employment with defendant-employer when she fell on a wet floor, catching herself with her right hand and falling on the right side of her posterior.
4. Thereafter, defendant accepted liability for plaintiff's wrist injury with a Form 21 filed in September 1999. Consequently, permanent partial disability compensation was voluntarily paid for plaintiff's wrist injury. Defendant denied plaintiff's back injury.
5. Later in the evening on the date of the injury by accident, plaintiff's low back began aching. This pain eventually radiated into her right leg. Dr. Ayscue with Blue Ridge Primary Care who treated plaintiff's wrist initially saw plaintiff. Thereafter, on May 27, 1998, plaintiff was seen by her family physician, Dr. Edward Yellig, an internist. Plaintiff was subsequently referred to Dr. Krakauer for her wrist pain. Although Dr. Krakauer did not treat plaintiff for any back complaints, the intake form completed in his office on June 3, 1998 indicates that plaintiff was experiencing low back pain at the time.
5. Dr. Yellig continued to treat plaintiff for her back complaints and recommended physical therapy and an MRI. In addition, x-rays of plaintiff's back taken on June 8, 1998 revealed degenerative disc disease at L4-5 and L5-S1.
6. By September 14, 1998, Dr. Yellig diagnosed plaintiff with fibromyalgia and degenerative disc disease of the lumbosacral spine. He also prescribed Prozac to treat plaintiff's depression. By February 19, 1999, Dr. Yellig thought that plaintiff suffered from chronic fatigue syndrome.
7. Dr. Yellig opined that plaintiff's low back symptoms and fibromyalgia were caused by the fall on May 22, 1998. It is his opinion that plaintiff's pre-existing back condition was aggravated by the fall and that the fall was a significant contributing factor in the *Page 4 
development of her low back symptoms.
8. During his deposition, Dr. Yellig initially testified that plaintiff was permanently and totally disabled. However, Dr. Yellig also testified that plaintiff could work. Once presented with the definition of permanently and totally disabled as an ability to earn wages, Dr. Yellig ultimately opined that plaintiff was not permanently and totally disabled.
9. Upon referral from Dr. Yellig, plaintiff presented to Dr. T. Craig Derian, an orthopedic surgeon, on July 1, 1999. Dr. Derian ordered an MRI, which revealed that plaintiff had multiple level disc degeneration of the low back with no definite disc rupture or spinal stenosis. Dr. Derian found plaintiff to be at maximum medical improvement with a ten percent permanent partial disability of the back. He also found plaintiff capable of performing light duty work with frequent position changes and a fifteen-pound lifting restriction.
10. According to Dr. Derian, the symptoms for which he treated plaintiff were related to her fall of May 22, 1998 and plaintiff's fall aggravated her pre-existing, non-symptomatic degenerative disc condition. Dr. Derian also indicated that plaintiff may continue to experience some waxing and waning of her pain symptoms.
11. Plaintiff was seen by Dr. George Venters, an orthopedic surgeon, on July 27, 1999 for an independent medical examination. Dr. Venters indicated that the fall of May 22, 1998 did not cause plaintiff's degenerative disc disease, although plaintiff's account of her pain is consistent with aggravation of here condition. Dr. Venters opined that no further active treatment was needed. He had a difficult time assessing a permanent partial impairment rating based on plaintiff's subjective complaints, but he did indicate that plaintiff's permanent partial disability rating would be somewhere between five and ten percent. Dr. Venters also recommended that plaintiff avoid repetitive lifting and bending. *Page 5 
12. On February 6, 2002, the Full Commission entered an Opinion and Award finding that plaintiff "sustained injury to her right wrist and low back and developed symptoms of fibromyalgia" and that plaintiff was not permanently and totally disabled as a result of the May 22, 1998 accident. The Full Commission's Opinion and Award was affirmed by the Court of Appeals.
13. In the prior Opinion and Award, the Full Commission specifically found that throughout plaintiff's medical treatment following her injury by accident of May 22, 1998, plaintiff continued to work for defendant, that plaintiff demonstrated an ability to continue to earn wages, and that plaintiff is not permanently and totally disabled as a result of any injuries or conditions relating to her injury by accident.
14. In the matter at hand, plaintiff contends that she has sustained a change of condition such that she was not able to retain employment since July 21, 1999, although plaintiff actually worked until November 25, 1999.
15. Dr. Yellig testified in his December 10, 1999 deposition that plaintiff's intellect was not impaired and that plaintiff was not permanently and totally disabled from being able to perform any employment.
16. Dr. Derian opined that plaintiff had reached maximum medical improvement and sustained at least a ten percent impairment rating to her back and that she could continue to perform her job as an assistant librarian.
17. Dr. Venters performed an independent medical examination in this case in July 1999. Dr. Venters agreed with the restrictions given by Dr. Derian and that plaintiff was able to perform in a light duty type job with no lifting greater than 15 pounds and where she would be allowed frequent position changes from sitting to standing to walking. Dr. Venters concluded *Page 6 
that plaintiff had a five to ten percent impairment rating to her back as a result of the compensable injury under the North Carolina Workers' Compensation guidelines.
18. Dr. Yellig testified on December 10, 1999 that plaintiff was out of work on disability benefits, but did not testify that he had taken plaintiff out of work.
19. After plaintiff's injury, she returned to work for defendant in another library in a less physically challenging library assistant position. Plaintiff continued in this position until she went out of work on *Page 7 
November 25, 1999 on disability benefits provided through the State Retirement System. Plaintiff was entitled to disability benefits under the State Retirement System despite the fact that she was able to work because the "disability," for purposes of the State Retirement System, was based on her inability to perform her "own employment," which (as relevant to this case) was her employment in May 1998 when she was injured. Plaintiff's disability application reflects that plaintiff could not perform her "regular job," which refers to the job she was doing when injured and not the light duty position she was performing when she applied for disability benefits. Because of plaintiff's eligibility for State disability benefits, she had the option to continue to work for defendant in her new light duty position or to leave employment and receive State disability retirement benefits. Plaintiff chose to accept disability retirement benefits and resigned from employment. Because the State Retirement System uses a different standard for disability than the workers' compensation system, the fact that plaintiff was entitled to State disability benefits does not establish that she is disabled for the purposes of workers' compensation.
20. The undersigned found in the Opinion and Award dated February 6, 2002 that plaintiff is able to earn wages and is not permanently and totally disabled.
21. Plaintiff has continued on State Retirement System disability benefits since November 25, 1999 and was on these benefits at the time of the hearing before Deputy Commissioner DeLuca.
22. On March 20, 2002, a functional capacity evaluation was performed at Raleigh Orthopaedic Clinic which revealed that plaintiff had exhibited self-limiting effort in several areas of measure; nonetheless, the conclusion was that plaintiff could perform work at the light duty level.
23. Ron Alford, a certified rehabilitation professional, testified that he has performed a labor market survey concerning plaintiff's transferable skills and found that there are many positions available in the Raleigh area which plaintiff is capable of performing. Mr. Alford described plaintiff's position at N.C. State University when she left as being within the light duty level of effort and was consistent with her subsequent FCE of March 20, 2002.
24. Dr. Kittelberger, an anesthesiologist, initially testified during his deposition that plaintiff was disabled. However, this opinion was given following hypothetical questions posed by plaintiff's counsel based on the assumption that plaintiff was removed from her light duty position by Dr. Yellig. The undersigned hereby find that the facts forming the basis of the hypothetical posed by plaintiff's counsel are not supported by the record in this case and are not found as facts herein.
25. The evidence in this matter establishes that plaintiff had returned to a light duty position for employer following her injury. Plaintiff continued in this employment until November 25, 1999, when she elected, on her own without being removed for light duty work by a physician, to accept disability benefits from the State Retirement System. Neither Dr. Yellig nor the Full Commission found that plaintiff was totally disabled when she left employment in November 1999. *Page 8 
26. Dr. Kittelberger determined that plaintiff was disabled because she was deconditioned as a consequence of her leaving work and assuming a sedentary lifestyle and that her deconditioning is not necessarily due to her injury. Dr. Kittelberger was unable to opine as to whether plaintiff could have continued to work had she not elected to retire on State Retirement System disability. The undersigned hereby find that Dr. Kittelberger's testimony does not establish that plaintiff was not and is not able to engage in any employment as a result of her compensable injury.
27. Dr. Kittelberger did not request an FCE, work hardening, or perform any other testing to determine plaintiff's ability to work.
28. Plaintiff is currently under the care of Dr. Hedrick, a family practitioner who has had residency training in pediatrics and internal medicine. Like Dr. Kittelberger, Dr. Hedrick was asked a hypothetical question involving inaccurate facts, specifically requesting that he assume that plaintiff returned to work in a highly modified job at N.C. State University and that in 1999 Dr. Yellig removed her from work. Dr. Hedrick agreed with the representation that Dr. Yellig had found plaintiff to be totally disabled in 1999 and continued to be totally disabled.
29. Dr. Hedrick first saw plaintiff in April 2003. Dr. Hedrick did not recommend a functional capacity evaluation or other tests to determine her ability to work. He testified that plaintiff told him that she had an FCE before, and her physicians told plaintiff that she was not able to work and thereby he did not feel it necessary to order another FCE. Dr. Hedrick had not reviewed the prior FCE and thereby was not able to compare the findings of the 2002 FCE, which found that plaintiff could work at the light duty level, with his opinion that she was not able to work.
30. Dr. Hedrick testified that his opinions were based on the assumption that plaintiff *Page 9 
could not work. The hypothetical questions posed to Dr. Hedrick asked him to assume that plaintiff was attempting to return to highly modified work when Dr. Yellig took her off from work and she was found to be qualified for State Retirement System disability. The hypothetical incorrectly assumed that plaintiff had an unsuccessful return to work, that she returned to a highly modified job, and that she was in fact removed from this position by Dr. Yellig. Further, Dr. Hedrick's opinions were based on plaintiff's subjective history. Accordingly, the undersigned give little weight to Dr. Hedrick's opinion.
31. After plaintiff retired on State Retirement System disability benefits, she did not seek further employment.
32. Plaintiff left suitable employment when she chose to leave defendant's employ on November 25, 1999 and elected to receive State Retirement System disability benefits in lieu of continued employment.
33. The greater weight of the competent evidence is that plaintiff could perform the work when she returned to a lighter duty position at N.C. State University and left this position only because she qualified for State Retirement System disability benefits. The evidence shows that plaintiff qualified for these benefits due to her inability to perform her "own employment", which was in the medium work level. Even though Dr. Yellig had approved plaintiff's application for State Retirement System disability for her former position, he testified that plaintiff was capable of employment.
34. The undersigned found in the prior Opinion and Award filed on February 6, 2002, that following plaintiff's injury, she demonstrated an ability to continue to earn wages and, accordingly, was not permanently and totally disabled.
35. After plaintiff left her employment in November, 1999, and despite adopting a *Page 10 
sedentary lifestyle, a 2002 FCE found that plaintiff was capable of light duty work.
36. The opinions of Dr. Kittelberger and Dr. Hedrick that plaintiff is not able to work are given little weight as they did not perform a functional capacity evaluation or other testing to measure plaintiff's ability to work. The opinions of these doctors relied on inaccurate information (including Dr. Kittelberger's belief that the FCE results indicated that plaintiff could not work) and on plaintiff's subjective history, and are not given as much weight as the functional capacity evaluation.
37. Plaintiff's election to retire on State Retirement System disability benefits does not have any bearing on the Full Commission's findings that plaintiff was capable of earning wages. Further, her election to accept these State Retirement System benefits does not establish that plaintiff is incapable of earning wages.
38. Following the close of evidence in this matter, plaintiff filed a medical motion to Deputy Commissioner DeLuca requesting payment for prescription medication prescribed by Dr. Hedrick. Defendant opposed the motion, and in the alternative, requested permission to re-open the record to take the depositions of Dr. Hedrick and Dr. Siegel on this issue. This request was denied by Deputy Commissioner DeLuca, and the medical motion was granted. Accordingly, the undersigned lack the medical evidence needed to make a determination on this issue.
39. Defendant has not engaged in stubborn, unfounded litigiousness during the course of defending this claim.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following: *Page 11 
 CONCLUSIONS OF LAW
1. On May 22, 1998, plaintiff sustained an admittedly compensable injury by accident arising out of and in the course of her employment with defendant-employer. As a result of the injury by accident of May 22, 1998, plaintiff sustained injuries to her right wrist and low back and developed symptoms of fibromyalgia for which plaintiff required medical treatment. N.C. Gen. Stat. § § 97-2(6), 97-25.
2. In order to qualify for compensation under the Workers' Compensation Act, a claimant must prove both the existence and extent of disability. Hilliard v. Apex Cabinet Co., 305 N.C. 593, 290 S.E.2d 682
(1982). To support a conclusion of disability, the plaintiff must prove and the Industrial Commission must find that: (1) plaintiff was incapable after her injury of earning the same wages earned prior to injury in the same employment, (2) plaintiff was incapable after her injury of earning the same wages she earned prior to injury in any other employment, and (3) plaintiff's incapacity to earn wages was caused by her compensable injury. Hilliard, 305 N.C. at 595, 290 S.E.2d at 683. Disability can be total or partial in nature, and it can be temporary or permanent in duration. N.C. Gen. Stat. § § 97-29, 97-30, 97-31. Further, the question is whether plaintiff is incapable of work inany employment. See Demery v. Perdue Farms, 143 N.C. App. 259,545 S.E.2d 485 (2001).
3. As plaintiff is capable of some work, she has failed to prove that she is permanently and totally disabled as a result of her injury by accident of May 22, 1998 and is therefore not entitled to permanent and total disability compensation. N.C. Gen. Stat. § 97-29.
4. Further, even if plaintiff had been able to prove permanent and total disability, plaintiff has elected to receive State Retirement System disability benefits and is not entitled to recover both long term disability benefits and workers' compensation disability benefits for the *Page 12 
same period. N.C. Gen. Stat. § 97-42, 136-106.
6. Plaintiff has not suffered a change of condition. N.C. Gen. Stat. § 97-47.
6. As defendant's actions in the course of litigation of this case do not constitute stubborn, unfounded litigiousness, defendant is not responsible for payment of plaintiff's attorney's fees. N.C. Gen. Stat. § 97-88.1.
 * * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following:
 A W A R D
1. Plaintiff's claim for additional disability benefits is DENIED.
2. Plaintiff's medical motion requesting authorization of medications prescribed by Dr. Hedrick is hereby held in abeyance. The record is hereby reopened pursuant to defendants' request to take depositions of Drs. Hedrick and Siegel on the issue. The parties shall have 60 days from the date of filing of this Order in which to depose these physicians and file contentions with the author of this opinion unless this issue is resolved sooner.
3. Each side shall pay its own costs.
This the 27th day of March, 2007.
 S\__________________ DIANNE C. SELLERS COMMISSIONER
 CONCURRING: *Page 13 
 S\_______________ LAURA K. MAVRETIC COMMISSIONER
 S\_______________ CHRISTOPHER SCOTT COMMISSIONER